# UNITED STATES DISTRICT COURT

## WESTERN DISTRICT OF LOUISIANA

## MONROE DIVISION

| | |
|---|---|
| **STEPHANI MARIE STEINBECK REEVES** | **CIV. ACTION NO. 3:21-01097** |
| **VERSUS** | **JUDGE TERRY A. DOUGHTY** |
| **KILOLO KIJAKAZI, ACTING COMMISSIONER, U.S. SOCIAL SECURITY ADMINISTRATION** | **MAG. JUDGE KAYLA D. MCCLUSKY** |

## REPORT AND RECOMMENDATION

Before the court is Plaintiff's petition for review of the Commissioner's denial of social security disability benefits. The district court referred the matter to the undersigned United States Magistrate Judge for proposed findings of fact and recommendation pursuant to 28 U.S.C. § 636(b)(1)(B) and (C). For the reasons assigned below, it is recommended that the decision of the Commissioner be **REVERSED and REMANDED for further proceedings.**

## Background & Procedural History

Stephani Steinbeck Reeves filed the instant application for Title XVI supplemental security income payments on March 8, 2019. (Tr. 22, 190-196).[1] Reeves, who was 43 years old at the time of the administrative hearing, asserted a disability onset date of October 28, 2018, because of post-traumatic stress disorder, panic disorder, stroke, low vision, and heart problems. (Tr. 43, 214, 222). The state agency denied the claim initially on September 9, 2019, and upon reconsideration on January 2, 2020. (Tr. 76-118, 121-127). Thereafter, Reeves requested and received a June 23, 2020 hearing before an Administrative Law Judge ("ALJ"). (Tr. 38-75). In a September 16, 2020 written decision, the ALJ determined that Reeves was not disabled under

---

[1] Reeves filed prior applications in 2009, 2012, and 2015. *See* Tr. 79, 222-223. They were denied at the hearing level and not further appealed. *Id.*

the Social Security Act, finding at step five of the sequential evaluation process that she was able to make an adjustment to work that exists in significant numbers in the national economy.  (Tr. 19-32).  Reeves appealed the adverse decision to the Appeals Council.  On February 19, 2021, however, the Appeals Council denied Reeves' request for review; thus, the ALJ's decision became the final decision of the Commissioner.  (Tr. 1-3).

On April 24, 2021, Reeves filed the instant complaint for judicial review of the Commissioner's final decision.  Following submission of the administrative transcript and supporting memoranda, the matter is now before the court.

### Standard of Review

This court's standard of review is (1) whether the final decision is supported by substantial evidence, and (2) whether the Commissioner applied the proper legal standards to evaluate the evidence.  *Keel v. Saul*, 986 F.3d 551, 555 (5th Cir. 2021) (citation omitted).  The Supreme Court has emphasized that

> [t]he phrase "substantial evidence" is a "term of art" used throughout administrative law to describe how courts are to review agency factfinding.  Under the substantial-evidence standard, a court looks to an existing administrative record and asks whether it contains "sufficien[t] evidence" to support the agency's factual determinations.  And whatever the meaning of "substantial" in other contexts, the threshold for such evidentiary sufficiency is not high. Substantial evidence, this Court has said, is "more than a mere scintilla."  It means—and means only—"such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."

*Biestek v. Berryhill*, ___ U.S.___, 139 S.Ct. 1148, 1154 (2019) (internal citations omitted).  The reviewing court may not reweigh the evidence, try the issues *de novo*, or substitute its judgment for that of the Commissioner.  *Greenspan v. Shalala*, 38 F.3d 232, 236 (5th Cir. 1994).

Upon finding substantial evidence, the court may only review whether the Commissioner has applied proper legal standards and conducted the proceedings consistently with the statute

and regulations. *Carter v. Heckler*, 712 F.2d 137, 140 (5th Cir. 1983). In other words, where the Commissioner's decision is supported by substantial evidence, the findings therein are conclusive and must be affirmed – *unless* the Commissioner applied an incorrect legal standard that materially influenced the decision. *See* 42 U.S.C. § 405; *Newton v. Apfel*, 209 F.3d 448, 452 (5th Cir. 2000); *Boyd v. Apfel*, 239 F.3d 698, 704 (5th Cir. 2001).

## Determination of Disability

Pursuant to the Social Security Act ("SSA"), individuals who contribute to the program throughout their lives are entitled to payment of insurance benefits if they suffer from a physical or mental disability. *See* 42 U.S.C. § 423(a)(1)(D). The SSA defines a disability as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months . . ." 42 U.S.C. § 423(d)(1)(A). A disability may be based on the combined effect of multiple impairments which, if considered individually, would not be of the requisite severity under the SSA. *See* 20 C.F.R. § 404.1520(a)(4)(ii). Based on a claimant's age, education, and work experience, the SSA utilizes a broad definition of substantial gainful employment that is not restricted by a claimant's previous form of work or the availability of other acceptable forms of work. *See* 42 U.S.C. § 423(d)(2)(A).

The Commissioner of the Social Security Administration has established a five-step sequential evaluation process that the agency uses to determine whether a claimant is disabled under the SSA. *See* 20 C.F.R. §§ 404.1520, 416.920. The steps are as follows,

(1)     An individual who is performing substantial gainful activity will not be found disabled regardless of medical findings.

(2)     An individual will be found not disabled if he or she does not have a "severe impairment," or a combination of impairments that is severe, and

3

of the requisite duration.

(3)     An individual whose impairment(s) meets or equals a listed impairment in [20 C.F.R. pt. 404, subpt. P, app. 1], and meets the duration requirement, will be considered disabled without the consideration of vocational factors.

Before proceeding to step four, the Commissioner assesses the individual's residual functional capacity, which is used at both step four and step five to evaluate the claim.

(4)     If an individual's residual functional capacity is such that he or she can still perform past relevant work, then a finding of "not disabled" will be made.

(5)     If an individual is unable to perform past relevant work, then other factors including age, education, past work experience, and residual functional capacity must be considered to determine whether the individual can make an adjustment to other work in the economy.  If the individual can make such an adjustment, then he or she will be found not disabled.  If the individual is unable to adjust to other work, then he or she will be found disabled.

*See Boyd v. Apfel*, 239 F.3d 698, 704 -705 (5th Cir. 2001); 20 C.F.R. §§ 404.1520, 416.920.

When a finding of "disabled" or "not disabled" may be made at any step, a decision will be rendered at that point without proceeding to the remaining steps.  20 C.F.R. §§ 404.1520, 416.920; *Villa v. Sullivan*, 895 F.2d 1019, 1022 (5th Cir. 1990).  "The claimant bears the burden of proof on the first four steps, but the Commissioner bears the burden on the fifth step."  *Salmond v. Berryhill*, 892 F.3d 812, 817 (5th Cir. 2018) (citation omitted).

## The ALJ's Findings

### I.     Steps One, Two, and Three

The ALJ determined at step one of the sequential evaluation process that the claimant did not engage in substantial gainful activity during the relevant period.  (Tr. 24).  At step two, she found that the claimant suffered severe impairments of premature ventricular contractions, supraventricular tachycardia, lumbar degenerative disc disease and stenosis, obesity, post-

traumatic stress disorder, depressive disorder, and generalized anxiety disorder.  (Tr. 24-25).[2]

She concluded, however, that the impairments were not severe enough to meet or medically

equal any of the impairments listed in Appendix 1, Subpart P, Regulations No. 4, at step three of

the process.  (Tr. 25-27).

## II.    Residual Functional Capacity

The ALJ next determined that the claimant retained the residual functional capacity

("RFC") to perform light work,[3] except:

> the claimant can occasionally stoop, kneel, crouch, or crawl.  She can
> occasionally climb ramps or stairs, but never climb ladders, ropes, or scaffolds.
> The claimant must avoid all exposure to workplace hazards, such as dangerous
> moving machinery and unprotected heights.  The claimant is limited to unskilled
> work activity defined as simple, routine tasks, involving short simple instructions,
> making simple work related decisions with few workplace changes.  The claimant
> can have occasional social interactions with co-workers and the general public,
> with routine supervision.  The claimant will be off-task less than 10 percent, due
> to symptoms of severe impairments.

(Tr. 27-31).

## III.   Steps Four and Five

---

[2] The ALJ further determined that the claimant's medically determinable impairments of alcohol-induced chronic pancreatitis, exocrine pancreatic insufficiency, chronic hepatitis C, and right eye vision loss were not severe.  *Id*.

[3] Light work entails:

> . . . lifting no more than 20 pounds at a time with frequent lifting or carrying of
> objects weighing up to 10 pounds. Even though the weight lifted may be very
> little, a job is in this category when it requires a good deal of walking or standing,
> or when it involves sitting most of the time with some pushing and pulling of arm
> or leg controls. To be considered capable of performing a full or wide range of
> light work, you must have the ability to do substantially all of these activities. If
> someone can do light work, we determine that he or she can also do sedentary
> work, unless there are additional limiting factors such as loss of fine dexterity or
> inability to sit for long periods of time.

20 C.F.R. §§ 404.1567(b), 416.967(b).

With the assistance of a vocational expert ("VE") the ALJ determined at step four of the sequential evaluation process that the claimant was unable to return to past relevant work. (Tr. 31). Accordingly, she proceeded to step five. At this step, the ALJ determined that the claimant was a younger individual, with a limited education. *Id*. Transferability of skills was not material to the decision. *Id*.

The ALJ next observed that given the claimant's vocational factors, and if she had an RFC that did not include any non-exertional limitations, then the Medical-Vocational Guidelines would direct a finding of not disabled. 20 C.F.R. §§ 404.1569, 416.969; Rule 202.18, Table 2, Appendix 2, Subpart P, Regulations No. 4; Tr. 31-32. However, because the claimant's RFC *did* include non-exertional limitations, the ALJ consulted a VE to determine whether, and to what extent the additional limitations eroded the occupational base for work. *Id*. In response, the VE identified the representative jobs of **housekeeping cleaner**, *Dictionary of Occupational Titles* ("DOT") Code # 323.687-014; **price marker**, DOT # 209.587-034; **router**, DOT # 222.587-038; **document preparer**, DOT # 249.587-018; **cutter and paster**, DOT # 249.587-014; and **surveillance systems monitor**, DOT # 379.367-010, that were consistent with the ALJ's RFC and the claimant's vocational profile. (Tr. 31-32, 70-72).[4]

---

[4] The VE responded that for the housekeeping cleaner, price marker, router, document preparer, cutter and paster, and surveillance systems monitor jobs there were 233,070, 283,215, 54,540, 436,385, 60,775, and 8,475 positions available nationwide, respectively. (Tr. 31-32, 70-72). This incidence of work constitutes a significant number (and range) of jobs in the "national economy." 42 U.S.C. § 423(d)(2)(A); *Johnson v. Chater*, 108 F.3d 178, 181 (8th Cir. 1997) (200 jobs at state level and 10,000 nationally, constitute a significant number).

## Non-Exhaustive Chronology of Relevant Medical Evidence

An August 25, 2016 echocardiogram showed normal left ventricular size, thickness, and function with 60-65 percent ejection fraction.  (Tr. 309-310).  There also was abnormal relaxation, with trace to mild regurgitation.  *Id*.

On February 14, 2017, David Scott Burkett, M.D., questioned whether Reeves' documented, but rare, PVCs even were a clinical problem.  (Tr. 293).  He believed that anxiety was more of a problem.  *Id.*

On March 27, 2018, Reeves underwent an ablation performed by Dr. Burkett.  (Tr. 314-339).  Dr. Burkett noted that Reeves had recurrent palpitations on a daily basis, with heart rates as high as 150 bpm.  (Tr. 329-330).  She often presented to the emergency room or the clinic complaining of palpitations, but her rhythm was that of sinus tachycardia.  *Id.*  Dr. Burkett had tried every medicine available to slow sinus node activity.  *Id.*   She had an inappropriate tachycardia with a resting heart rate from 90-110 bpm.  (Tr. 331).  With simple and minimal physical exertion, however, the heart rate increased to 150 bpm.  *Id.*  Prior to the ablation, Burkett was unable to induce any cardiac arrhythmias whatsoever.  *Id.*  The ablation appeared to be acutely successful.  *Id.*  Reeves achieved a 20 percent reduction in the heart rate.  *Id.* However, later that same day, or the next, Reeves had to receive a pacemaker secondary to bradycardia from the SA modification.  (Tr. 339-347).

On March 28, 2018, whilst still recovering in the hospital from the procedure, Sudha Ranganathan, M.D., noted that Reeves was upset and did not wish to talk to her any longer because she purportedly had been unprofessional when she asked Reeves why she had PTSD (for purposes of her Xanax prescription), in front of a physician's assistant.  (Tr. 376).  Dr. Ranganathan had suggested that Reeves have her psychiatrist wean her off of Xanax because of

its depressive and addictive potential.  *Id.*  Reeves reported that she had been upset and crying all day and that she had just gotten off the phone complaining to the patient advocate.  *Id.*  After Dr. Ranganathan explained why she had to go over her medication list, Reeves voiced understanding and wanted a hug.  *Id.*  She praised Dr. Ranganathan and apologized for the misunderstanding. *Id.*  Dr. Ranganathan noted that Reeves had a long psychiatric history, including a history of addition and poly-pharmacy.  *Id.*  She added that Reeves seemed to have manipulative behavior. *Id.*  Reeves was discharged from the hospital on March 29, 2018.  (Tr. 377).

On April 1, 2018, Reeves went to the emergency room with complaints of palpitations. (Tr. 531-543).  She reported that she was an everyday smoker.  *Id.*  She denied back pain and weakness.  *Id.*  She ambulated without difficulty and moved all extremities without difficulty. *Id.*  Dr. Musgrove wrote that Reeves was asymptomatic.  *Id.*  He advised her to go to Conway. *Id.*  Nonetheless, Reeves signed out against medical advice.  *Id.*

On April 4, 2018, a Holter monitor indicated that Reeves had a heart rate that ranged from 60 bpm to as high 133.  *Id.*  However, when Reeves had triggered events of heart racing and feeling dizzy, there were no significant findings and her heart rate ranged from 97-100.  *Id.* In short, her symptoms did not correlate with episodes of sinus tachycardia and there were no significant abnormalities.  *Id.*

Reeves saw Kathleen Moore, N.P. on April 9, 2018, for follow-up.  (Tr. 312-313).  She was doing well.  *Id.*

Reeves saw Haley Haught, F.N.P., on September 4, 2018, for chronic disease management.  (Tr. 480-484).  She complained of right heel pain that was worse in the mornings, but noted that the symptoms had improved since she last was there.  *Id.*  Haught diagnosed, *inter alia*, plantar fasciitis.  *Id.*

8

Reeves returned to Haught on October 23, 2018, for anxiety. (Tr. 476-480). She complained of increased anxiety stemming from nervousness about an upcoming surgery. *Id.* She denied any other problems or complaints at that time. *Id.* She had been smoking lately to help handle the anxiety. *Id.* Haught diagnosed generalized anxiety disorder. *Id.*

Reeves next saw Haught on December 5, 2018, for chronic disease management. (Tr. 472-476). She reported increased anxiety associated with an upcoming trip to Las Vegas and an upcoming surgery on January 14, 2019. *Id.* Otherwise, she denied new problems or complaints. *Id.* Haught assessed her with GERD. *Id.*

Reeves returned to Dr. Burkett on January 4, 2019, for cardiac clearance. (Tr. 306-311). She had received a pacemaker in March and had felt much better since the surgery. *Id.* She no longer had chest pain or shortness of breath. *Id.* She was able to exercise and had lost 25 pounds since her surgery. *Id.* Her cardiac risks were low, and she was cleared for surgery. *Id.*

On February 6, 2019, Reeves saw Nurse Haught for right abdominal pain and her blood pressure. (Tr. 464-468). Reeves had no depression, sleep disturbances, or anxiety. *Id.* She had good judgment, normal mood and affect. *Id.* She had undergone an unrelated surgical procedure on January 14, 2019. *Id.* Reeves had increased blood pressure, heart rate, and anxiety. *Id.* She was not a candidate for hormone replacement. *Id.* She was a one-pack-per-week smoker. *Id.* Haught diagnosed, *inter alia*, hypertension. *Id.*

Reeves next saw Nurse Haught on March 12, 2019, for chronic disease management with labs. (Tr. 460-464). She had no muscle aches, arthralgias/joint pain, back pain, swelling, or neck pain. *Id.* She had no depression or sleep disturbances. *Id.* Her anxiety had improved. *Id.* She had a normal gait and station. *Id.* Reeves denied any other complaints at that time. *Id.*

9

On March 26, 2019, Reeves was seen for an initial examination with Lois Mason, P.T. (Tr. 557-563).  Reeves reported intermittent tingling in her right thigh.  *Id.*  Walking and standing increased her pain within 30 minutes.  *Id.*  Reeves was scheduled for another ablation in April 2019 with possible defibrillator placement.  *Id.*  Her primary complaint was radiating pain into her right lower extremity.  *Id.*  At its worst, the pain was a ten; at its best, it was a two; it currently was a five.  *Id.*  She described the pain as throbbing, with tingling, and muscle spasms.  *Id.*  She was able to stand for 30 minutes and sit for one hour.  *Id.*  She had minimal loss upon flexion of the lumbar spine, but maximum loss of extension  *Id.*

A March 28, 2019 x-ray of the lumbar spine showed mild to moderate degenerative disk and arthritic changes throughout the lumbar spine.  (Tr. 499, 556).

On April 1, 2019, Reeves tolerated her therapy poorly, with complaints of pain throughout most extremities.  (Tr. 564-565).

On April 4, 2019, Reeves reported that the physical therapy exercises had helped, and she had been sleeping better with decreased pain.  (Tr. 566-567).

On April 8, 2019, Reeves tolerated treatment well, with no complaints of increased pain or fatigue.  (Tr. 568-569).

Reeves saw Michael Drew, M.D. on April 14, 2019.  (Tr. 603-606).  She reported moderate left chest pain after lifting three-pound weights.  *Id.*

On April 28, 2019, Reeves went to the emergency room for a panic attack.  (Tr. 959-966).  She stated that she had a history of panic attacks, with recent family stressors.  *Id.*  She reported a recent disagreement with a significant other.  *Id.*  She had not been taking her Xanax regularly.  *Id.*  However, she took her medication 30 minutes prior to arrival and now felt fine,

without symptoms. *Id.* Within about 15 minutes after arrival, she was laughing and talkative. *Id.* She was discharged to home in an improved condition. *Id.*

Reeves returned to Nurse Haught on April 29, 2019, for follow-up after her recent emergency room visit. (Tr. 834-838). She had been seen at Delhi Hospital on April 28, 2019, for complaints of anxiety. *Id.* She reported difficulty with vision in her right eye, tightening of her hands, dyspnea, numbness in her fingertips, and a sense of impending doom. *Id.* She reported increased stress and anxiety at home from family stressors. *Id.* She requested a change to her blood pressure medication. *Id.* Haught diagnosed essential hypertension, depressive disorder, and nicotine dependence. *Id.*

A May 8, 2019 MRI of the lumbar spine showed mild degenerative spondylosis at L4-5 and L5-S1. (Tr. 589-590, 869-870). There also was mild reduction of the canal diameter at L4-5 and minimal left neural foraminal narrowing. *Id.* There was no high-grade canal stenosis. *Id.*

On May 14, 2019, Reeves saw Haught for complaints of back and leg pain, which radiated down her right leg. (Tr. 830-833). She also complained of mid-back pain that began after she had completed physical therapy. *Id.* She further reported numbness and tingling in the right leg and arm. *Id.* She stated that she her back pain wakes her up at night. *Id.* She also had headaches, which had worsened the past week. *Id.* In addition, Reeves reported elevated blood pressure. *Id.* Haught assessed lumbar radiculopathy, back muscles spasms, insomnia, generalized anxiety disorder, and nicotine dependence. *Id.*

Reeves saw Dr. Burkett on June 12, 2019. (Tr. 600-603). She was negative for musculoskeletal complaints. *Id.* Upon examination, she had a normal range of motion. *Id.* She had no cardiac complaints, no chest pain, and no shortness of breath. *Id.* She looked and felt well. *Id.* She had no acute problems/complaints and a benign physical examination. *Id.*

11

Reeves next saw Haught on June 18, 2019, with complaints of muscle cramps in both legs, her feet, back, and sometimes in the upper abdomen. (Tr. 826-829). She admitted that she occasionally drank wine and beer. *Id.* Haught assessed lower limb cramps, mixed insomnia, and nicotine dependence. *Id.*

Reeves returned to Haught on July 2, 2019, for follow-up for back pain and muscle spasms. (Tr. 818-822). Her symptoms were not relieved with muscle relaxants. *Id.* Her blood pressure was elevated that morning and she had become dizzy after bending over and standing back up. *Id.* Upon examination, however, she had a normal range of motion. *Id.* Haught assessed essential hypertension, back muscle spasms, and nicotine dependence. *Id.*

In a July 3, 2019 progress note, Kaci Jo Pearce, NP, documented that Reeves complained of PTSD, insomnia, anxiety, and other mood disorders. (Tr. 596-599). She reported smoking marijuana nightly to relax, plus a quarter pack of cigarettes per day. *Id.* She had a history of illegal substance use, but had ceased by 2010. *Id.* She was very tearful, crying, anxious, and presented six hours early for her appointment. *Id.* Pearce assessed, *inter alia*, generalized anxiety disorder. *Id.* She was to follow-up in one year. *Id.*

On July 9, 2019, Reeves saw Haley Haught for a consultation about her medication. (Tr. 814-818). She reported increased blood pressure, increased anxiety, and hot flashes. *Id.* Haught told her that she would not prescribe hormone replacement and recommended that Reeves begin taking Paxil. *Id.* Haught diagnosed major depression, single episode, and essential hypertension. *Id.*

At the request of the state agency, Reeves underwent a July 13, 2019 consultative physical examination with Desiree Dawson, M.D. (Tr. 631-635). Reeves reported that she was unable to work because she had too many doctors' appointments. *Id.* She stated that she had

been diagnosed with ankylosing spondylitis which caused her significant back pain.  *Id.*  She added that she continued to have intermittent episodes of palpitations and dizziness because of her heart condition.  *Id.*  She reported right eye blindness.  *Id.*  She last worked at a laundromat in 2018.  *Id.*  She denied low back pain, mood changes, depression, nervousness, anxiety, difficulty concentrating, or difficulty sleeping at night.  *Id.*

Upon examination, Reeves was able to rise from a sitting position without assistance, stand on tiptoes, and heel and tandem walk without problem.  *Id.*  She also was able to bend and squat without difficulty.  *Id.*  She had 5/5 motor strength with adequate fine motor movements, and ability to grasp objects bilaterally.  *Id.*  She did not appear to be depressed or anxious.  *Id.*  Memory was intact.  *Id.*  She had 4/5 strength in her bilateral lower extremities.  *Id.*  Dr. Dawson opined that Reeves should be able to sit, walk, and/or stand for a full workday.  *Id.*  She had a normal range of motion in all joints.  *Id.*  However, she was limited by her chronic back pain and occasional heart palpitations such that she should be allowed occasional breaks throughout the day.  *Id.*  She remained unable to lift/carry objects greater than 20-25 pounds without limitations. *Id.*  However, she was able to hold a conversation, respond appropriately to questions, and carry out and remember instructions.  *Id.*

On July 16, 2019, Reeves saw Nurse Haught for a possible UTI.  (Tr. 810-814).  She reported that LSU-Neurology had told her to follow-up with her primary care physician for testing for ankylosing spondylitis.  *Id.*  Haught assessed dysuria, lumbar radiculopathy, essential hypertension, and nicotine dependence.  *Id.*

At the request of the state agency, Reeves underwent an August 5, 2019 consultative mental status examination with Candi Hill, Ph.D.  (Tr. 638-642).  Reeves reported that she had been diagnosed with PTSD around 2010, and further diagnosed with ADHD, depression, and

panic disorder.  *Id.*  She had participated in weekly counseling in the past, but had not seen her therapist in around one year.  *Id.*  She had a stroke on December 14, 2017, because of hypertension.  *Id.*  She stated that she began to lash out at people and to say things impulsively after she was told that she needed another surgery.  *Id.*  She was escorted out of a store and nearly removed from her doctor's office because of the outbursts.  *Id.*  In her social and leisure time, she enjoyed suntanning, hanging out with friends, riding on back roads, and listening to loud music.  *Id.*  She reported using illegal substances prior to 2009.  *Id.*  She admitted to continued marijuana use that began when she was 13 years old.  *Id.*  She became tearful when discussing her symptoms.  *Id.*

Hill opined that Reeves' sustained concentration, persistence, adaptation, and overall social abilities were average.  *Id.*  Hill diagnosed PTSD, cannabis use disorder, and to rule out specific learning disability.  *Id.*  She opined that Reeves' understanding was intact, and she was able to understand and follow through with simple, work-like procedures and instructions.  *Id.*  However, she would have difficulty recalling complex instructions and procedures.  *Id.*  She could work for average periods, with supervision, and maintain a normal work routine.  *Id.*  Overall social interaction was average.  *Id.*  She could relate to others without needing reminders to maintain socially appropriate behavior.  *Id.*  She would not have difficulty responding to changes in the work setting.  *Id.*  However, she likely would overreact and become physically aggressive if faced with a situation similar to past abuse.  *Id.*  Her prognosis was fair.  *Id.*

On August 6, 2019, Reeves saw Amy Barnes, P.A., for a new complaint of intermittent vomiting.  (Tr. 760-765).  A chest x-ray showed no acute pulmonary disease.  (Tr. 766).

Reeves returned to Haley Haught on August 21, 2019, for medication refill and complaints of back pain.  (Tr. 806-810).  She reported that when she was in Florida, her friend

14

had let her use some of her CBD, which was 60% THC and it helped to relieve her muscle spasms, back pain, insomnia, and anxiety. *Id.* Once she stopped using, however, her symptoms had returned. *Id.*

On August 22, 2019, non-examining agency psychologist, Suzanne Castro, Psy.D. reviewed the record and completed a mental residual functional capacity assessment form on which she indicated that Reeves was moderately limited in her ability carry out detailed instructions and in her ability to maintain attention and concentration for extended periods. (Tr. 91-92). She also was moderately limited in her ability to complete a normal workday and workweek without interruptions from psychologically-based symptoms and to perform at a consistent pace. *Id.* Furthermore, she was moderately limited in her ability to accept instructions and to respond appropriately to criticism from supervisors. *Id.* Castro opined that Reeves was capable of simple and some detailed tasks in a setting without a fast pace or strict production quotas. *Id.* She also was capable of superficial interaction. *Id.* Adaptation was adequate. *Id.*

On September 5, 2019, non-examining agency physician, Johnny Craig, M.D., reviewed the record and completed a physical residual functional capacity assessment whereon he indicated that Reeves was capable of the exertional capacity for light work, but limited to frequently climbing ramps/stairs, never climbing ladders or scaffolds, occasional stooping, kneeling, crouching, and crawling, plus the need to avoid all exposure to hazardous machinery, heights, etc. (Tr. 89-90).

On October 23, 2019, Reeves returned to Dr. Burkett for follow-up. (Tr. 779-782). She reported that her heart rate dropped at night, which she attributed to her Paxil use. *Id.* She could feel her pacemaker kicking in and it kept her awake at night. *Id.* She reported that she had been approved for medical marijuana in Alexandria. *Id.* Burkett adjusted her medication. *Id.*

On October 24, 2019, Reeves saw Haley Haught for right back pain, joint pain, and right hip pain. (Tr. 802-806). She also reported that her left foot tended to fall asleep, plus right elbow pain and burning/throbbing sensation when she first awakened in the morning. *Id.* Upon examination, Reeves had positive straight leg raise test, bilaterally. *Id.* Haught assessed right hip joint pain, lumbosacral radiculopathy, cervical radiculopathy, generalized anxiety disorder, and obesity. *Id.* However, an October 24, 2019 x-ray of the cervical spine showed minimal spondylotic change, without significant degenerative disc disease. (Tr. 866-867). Similarly, an October 24, 2019 x-ray of the lumbar spine showed mild spondylotic change, without acute findings. (Tr. 867-868). Finally, an October 24, 2019 x-ray of the right hip showed possible chronic calcific tendinitis or bursitis. (Tr. 869).

On October 25, 2019, Dr. Burkett completed a "Physical Assessment" form, which had been "dropped off" at his office on "11-14-19" [sic]. (Tr. 899-900). He stated that Reeves had a diagnosis of inappropriate sinus tachycardia resulting in near syncope and dyspnea. *Id.* Her symptoms would constantly interfere with her attention and concentration. *Id.* She needed more than the usual work breaks. *Id.* She could walk one-half city block without rest or significant pain. *Id.* She could sit for five hours in an eight-hour workday and stand/walk for a total of two hours, but not continuous. *Id.* She required ten-to-fifteen-minute breaks, two to three times per hour for her heart rate to return to baseline. *Id.* She was able to occasionally lift up to ten pounds and could reach for only 70 percent of an 8-hour workday. *Id.* Finally, she would be absent more than four times per month. *Id.*

Reeves returned to Dr. Burkett on November 22, 2019, for follow-up. (Tr. 999-1002). She had mild PACs, no PVCs, no arrhythmias, and, most of the time, she was in sinus tachycardia. *Id.* She wanted to consider an ablation after the first of the year." *Id.*

16

On December 15, 2019, Reeves went to the emergency room with complaints of sharp, but mild abdominal pain. (Tr. 1154-1178). At that time, she denied joint pain, arthralgia, back pain, swelling, neck pain, etc. *Id.* Upon examination, she had 5/5 motor strength in all extremities. *Id.* She was admitted for pancreatitis. *Id.* However, Reeves eloped from the hospital, against medical advice, sometime prior to Cynthia Wagnon, M.D.'s arrival on December 17, 2019. (Tr. 1179-1184).

On December 20, 2019, non-examining agency psychologist, Carissa Bokelberg, Psy.D., reviewed the record and issued a mental RFC that was consistent with the previous opinion by Dr. Castro. (Tr. 110-112). She added that Reeves' symptoms did not appear to cause marked limitations of functioning. *Id.*

On January 2, 2020, non-examining agency physician, Gerald Dzurik, M.D., completed a physical residual functional capacity assessment that reaffirmed Dr. Craig's findings. (Tr. 108-110).

Reeves saw Raj Bhandari, M.D. on January 17, 2020, for complaints of acute abdominal pain. (Tr. 1091-1095). He noted that Reeves had a significant alcohol and drug history but had been clean since 2008. *Id.* He counseled her on her diet and assessed alcohol-induced chronic pancreatitis. *Id.*

Reeves returned to Haught for follow-up of chronic disease management on February 12, 2020. (Tr. 1086-1091). She reported increased anxiety and insomnia because of family stressors. *Id.* She had normal movement of all extremities and normal gait and station. *Id.*

Reeves underwent a colonoscopy on February 14, 2020, with Raj Bhandari, M.D. (Tr. 1100-1101. He diagnosed, *inter alia*, exocrine pancreatic insufficiency from chronic alcohol pancreatitis. *Id.*

Reeves saw Haught on March 30, 2020, for complaints of dysuria and possible UTI. (Tr. 1078-1082). She reported increased cough from increased smoking stemming from increased stress related to the Covid-19 Pandemic, her husband losing his job, and a tree falling on their home. *Id.* She wanted to increase her Paroxetine. *Id.*

On April 9, 2020, Reeves returned to Haley Haught with complaints that she had fallen the day before and landed on her right hip and ankle. (Tr. 1073-1078). X-rays showed no acute abnormality. *Id.* She reported some dyspnea after lying outside in the sun with a friend. *Id.* She took marijuana oral oil twice per day. *Id.*

## Analysis

Reeves contends that the ALJ committed legal error in the weighing of opinion evidence, and, thus, her RFC determination is not supported by substantial evidence. Specially, she sets forth three assignments of error:

1.   **The ALJ's RFC determination is not supported by substantial evidence and the product of legal error where [s]he found various opinions regarding Plaintiff's mental impairments to be persuasive, but failed to reconcile that determination with Plaintiff's RFC;**

2.   **The ALJ's RFC determination is the product of legal error where [s]he failed to evaluate the opinion of consultative examiner, Desiree Dawson, M.D.; and**

3.   **The ALJ's RFC determination is the product of legal error where [s]he failed to properly evaluate the opinion of treating cardiologist, David S. Burkett, M.D.**

The court will segregate and discuss Reeves' arguments within the context of the ALJ's assessment of the effects of her mental and physical impairments. Before doing so, however, the court pauses to emphasize that for claims such as this that were filed on or after March 27, 2017, the Commissioner no longer affords "controlling weight" to the opinions of treating physicians

and will not defer or give any specific evidentiary weight to any medical opinion(s) from the claimant's medical sources.  20 C.F.R. §§ 404.1520c(a) and 416.920c(a).  Furthermore, the fact that a medical source actually examined the claimant or specializes in an area germane to the claimant's medical issues are not primary or dispositive considerations in assessing the medical opinion.  *See* 20 C.F.R. §§ 404.1520c(c) and 416.920c(c).  Rather, when determining the persuasiveness of a medical opinion, the most important factors are supportability and consistency.  20 C.F.R. §§ 404.1520c(b)(2) and 416.920c(b)(2).

"Supportability" focuses upon how "relevant the objective medical evidence and supporting explanations presented by a medical source are to support his or her medical opinion(s) or prior administrative medical finding(s) . . ." 20 C.F.R. §§ 404.1520c(c)(1) and 416.920c(c)(1).  "Consistency" refers to how "consistent a medical opinion(s) or prior administrative medical finding(s) is with the evidence from other medical sources and nonmedical sources in the claim . . ."  20 C.F.R. §§ 404.1520c(c)(2) and 416.920c(c)(2).

Only when two or more medical opinions about the same issue are both equally well-supported and consistent with the record, but "not exactly the same," will the Commissioner then articulate how she considered the "other most persuasive factors," such as the medical source's relationship with the claimant (including the length of the treatment relationship, frequency of examinations, purpose of the treatment relationship, extent of the treatment relationship, and the examining relationship); the medical source's specialization; and other factors (including a medical source's familiarity with other evidence of the claim or an understanding of the agency's disability program's policies and evidentiary requirements).  20 C.F.R. §§ 404.1520c(b)(3)-(c) and 416.920c(b)(3)-(c).  Otherwise, the Commissioner, may, but is not required to explain these additional factors.  20 C.F.R. §§ 404.1520c(b)(2) and 416.920c(b)(2).

I.    **Mental RFC**

Reeves contends that the ALJ erred because she deemed "persuasive" the opinions of

non-examining agency psychologists, Carissa Bokelberg and Suzanne Castro, plus the opinion of

the consultative psychologist, Candi Hill, but then inexplicably omitted key limitations of

functioning recognized by these medical sources, without explanation.  (Tr. 29-30).  Specifically,

the ALJ noted that Bokelberg and Castro found that Reeves was capable of "superficial

interaction" and that Hill stated that Reeves likely would overact and become physically

aggressive if faced with a situation similar to past abuse that she had suffered.  (Tr. 29-30).[5]

Moreover, the ALJ remarked that the opinions of Drs. Bokelberg and Castro were well supported

and consistent with the record.  (Tr. 29).  However, she did not include those limitations in her

RFC.

Ultimately, because of unspecified "issues with social judgment," the ALJ opted to limit

Reeves to "occasional interaction with co-workers and the public."  (Tr. 30).  Several district

courts, however, have held that a limitation to "occasional" interaction with supervisors and

coworkers does not encompass a need for only "superficial interaction."  *See Jomo T., v.*

*Commissioner of the Social Security Administration,* Civ. Action No. 21-0105, 2022 WL

3446342, at *4 (S.D. Ohio Aug. 17, 2022) (collecting cases).  To be sure, an ALJ is under no

obligation to mirror a medical opinion verbatim, but she does need to "meaningfully explain why

certain limitations are not included in the RFC determination, especially when such limitations

are set forth in opinions the ALJ weighs favorably."  *Id*. (citations omitted).  Furthermore, by

failing to explain why certain limitations were not incorporated into the RFC, the ALJ prevents a

---

[5] The two limitations do not appear to be unrelated.  A limitation to "superficial interaction"
would tend to limit the opportunity for situations to arise that might trigger painful memories.

reviewing court from conducting a meaningful review to determine whether the decision is supported by substantial evidence. *Id*.[6]

## II.    Physical RFC

Reeves contends that the ALJ failed to properly evaluate the opinion of her treating cardiologist, Dr. Burkett. The court recognizes that "the ALJ is free to reject the opinion of any physician when the evidence supports a contrary conclusion." *Martinez v. Chater*, 64 F.3d 172, 175-76 (5th Cir.1995) (citation omitted). However, an ALJ cannot reject a medical opinion without an explanation supported by good cause. *See Loza v. Apfel*, 219 F.3d 378, 395 (5th Cir. 2000) (citations omitted).

Here, the ALJ purported to reject the severe limitations of functioning endorsed by Dr. Burkett, as follows:

> [t]he undersigned finds Dr. B[ur]kett's opinion unpersuasive. Dr. Burkett did not adequately support his opinion with symptoms or abnormal examinations. Moreover, his opinion that the claimant is limited to less than sedentary work with sitting, standing, walking, and reaching limitations is inconsistent with the claimant's normal motor strength, normal extremity movements, normal gait, normal strength, intact cranial nerves, intact sensation, and equal reflexes.

---

[6] In her brief, the Commissioner attempted to shift the blame for the RFC omission upon Reeves because she had an opportunity to cross-examine the VE with a hypothetical that included the "superficial interaction" limitation, but neglected to do so. In support of her argument, the Commissioner cited the well-known provision from *Carey v. Apfel*, that

> claimants should not be permitted to scan the record for implied or unexplained conflicts between the specific testimony of an expert witness and the voluminous provisions of the DOT, and then present that conflict as reversible error, when the conflict was not deemed sufficient to merit adversarial development in the administrative hearing.

*Carey v. Apfel*, 230 F.3d 131, 146–47 (5th Cir. 2000). However, the Commissioner's reliance on *Carey* is misplaced. Reeves plainly is not raising an implied or unexplained conflict between the VE's testimony and the DOT. Moreover, it is the Commissioner, not the claimant, who bears the burden of proof at step five. *Salmond*, *supra*.

(Tr. 30). As Reeves pointed out in her brief, however, normal motor strength, gait, sensation, reflexes, etc., generally are considerations more pertinent to spinal impairments or direct injuries to the extremities. Dr. Burkett was treating Reeves for heart-related issues. Furthermore, at Reeves' most recent visit to Dr. Burkett on November 22, 2019, he noted that she was in sinus tachycardia most of the time and that she wanted to consider an ablation after the first of the year. (Tr. 999-1001). The fact that Dr. Burkett was entertaining another ablation is evidence that Reeves' sinus tachycardia was continuing to cause issues, which may have been the reason why he opined that she would require ten-to-fifteen-minute breaks, two to three times per hour to allow for her heart rate to return to baseline. (Tr. 899).

Moreover, Dr. Burkett was not the only cardiologist of record who opined that Reeves would need additional breaks. The consultative physician, Desiree Dawson, M.D., also stated that Reeves was limited by her chronic back pain and occasional heart palpitations and should be allowed occasional breaks throughout the day. (Tr. 633). However, as Reeves emphasized in her remaining assignment of error, the ALJ never weighed the persuasiveness of Dr. Dawson's opinion.

Under the regulations, the ALJ is required to articulate how persuasive she finds all of the medical opinions and all of the prior administrative medical findings in the claimant's case record. 20 C.F.R. § 404.1520c(b). An ALJ's failure to state what weight, if any, was given to an examining physician's opinion precludes plaintiff from being able to effectively appeal the denial of her claim for benefits. *Mitchell v. Colvin*, Civ. Action No. 13-1984, 2014 WL 4418240, at *2 (W.D. La. Sept. 5, 2014). Thus, the error is not harmless. *Id*. Indeed, if Dr. Dawson's opinion that Reeves needed "occasional" breaks throughout the day is coextensive

with the frequency and extent of the breaks recognized by Dr. Burkett in his medical source statement, then Dawson's opinion will undermine the ALJ's physical RFC.

In sum, because of the cumulative effect of the errors discussed above, the court is constrained to find that the ALJ's RFC is not supported by substantial evidence.

## III.    Step Five and Remand

Because the foundation for the ALJ's step five determination was premised upon an RFC that is not supported by substantial evidence, the court further finds that the Commissioner's ultimate conclusion that Reeves is not disabled, likewise is not supported by substantial evidence.

The courts enjoy the authority to enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the Commissioner of Social Security, with or without remanding the cause for a rehearing.  42 U.S.C. § 405(g).  When reversal is warranted, the matter is remanded with instructions to make an award only if the record enables the court to conclusively determine that the claimant is entitled to benefits.  *See Ferguson v. Heckler*, 750 F.2d 503, 505 (5th Cir. 1985); *see also Rini v. Harris*, 615 F.2d 625, 627 (5th Cir. 1980) (reversing and remanding with direction to enter judgment where the evidence was not substantial, and the record clearly showed the claimant's right to benefits).

The instant record is not so disposed.  Reeves' residual functional capacity assessment remains indeterminate.

## Conclusion

For the foregoing reasons,

IT IS RECOMMENDED that the Commissioner's decision be REVERSED and REMANDED pursuant to the fourth sentence of 42 U.S.C. § 405(g) for further proceedings

consistent herewith.

Under the provisions of 28 U.S.C. § 636(b)(1)(C) and FRCP Rule 72(b), the parties have **fourteen (14) days** from service of this Report and Recommendation to file specific, written objections with the Clerk of Court. A party may respond to another party=s objections within **fourteen (14) days** after being served with a copy thereof. A courtesy copy of any objection or response or request for extension of time shall be furnished to the District Judge at the time of filing. Timely objections will be considered by the District Judge before a final ruling issues.

**A PARTY'S FAILURE TO FILE WRITTEN OBJECTIONS TO THE PROPOSED FINDINGS, CONCLUSIONS AND RECOMMENDATIONS CONTAINED IN THIS REPORT WITHIN FOURTEEN (14) DAYS FROM THE DATE OF ITS SERVICE SHALL BAR AN AGGRIEVED PARTY, EXCEPT ON GROUNDS OF PLAIN ERROR, FROM ATTACKING ON APPEAL THE UNOBJECTED-TO PROPOSED FACTUAL FINDINGS AND LEGAL CONCLUSIONS ACCEPTED BY THE DISTRICT JUDGE.**

In Chambers, at Monroe, Louisiana, on this 24th day of August, 2022.

KAYLA DYE MCCLUSKY
UNITED STATES MAGISTRATE JUDGE

24